UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| ABNER HAYNES LISTER, | ) | Case No. 07-CV-0822-BEN (JMA) |
| Petitioner, | ) ) | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE ON PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | ) ) |  |
| JAMES TILTON, Secretary, et al., | ) ) |  |
| Respondents. | ) ) ) |  |

## I.   <u>Introduction</u>

Abner Haynes Lister ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCD 189393. (Lodgment No. 1, Clerk's Transcript ("CT"), at 195-196.)  Petitioner contends that trial counsel was constitutionally ineffective and that his federal constitutional right to an impartial jury was violated.  (<u>See</u> Petition, Grounds One and Two.)

///

1   The Court has considered the Petition, Respondent's Answer,
2   Petitioner's Traverse, and all the supporting documents submitted
3   by the parties.  Based upon the documents and evidence presented
4   in this case, and for the reasons set forth below, the Court
5   recommends that the Petition be **DENIED**.
6   **II.   Factual Background**
7   This Court gives deference to state court findings of fact
8   and presumes them to be correct.  Petitioner may rebut the
9   presumption of correctness, but only by clear and convincing
10  evidence.  28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506
11  U.S. 20, 35-36 (1992) (holding findings of historical fact,
12  including inferences properly drawn from such facts, are entitled
13  to statutory presumption of correctness).  The facts as found by
14  the state appellate court are as follows:

> [¶]  On March 1, 2005, at about 4:00 p.m., San Diego
> police officers conducted a "buy-bust" operation on C
> Street in downtown San Diego. Detective Philip
> Schneider, while wearing a wire and being watched by
> another officer, made eye contact with Lister from
> across the intersection of C Street and Fourth Avenue.
> Hand signals were exchanged indicating Lister could
> furnish cocaine base to Schneider. Lister motioned for
> the officer to cross the street. The officer met with
> Lister, who spoke first, asking, "What do you need?"
> that is, what quantity of cocaine base Schneider
> wanted. Schneider told him he wanted $20 worth. Lister
> asked if Schneider had the money with him. Schneider
> said he did and asked if Lister had the drugs on him.
> Lister said no, that they would have to go down the
> block to a "sister girl." Lister then asked if Schnei-
> der also wanted some marijuana. Schneider indicated he
> was interested. Lister took out a small baggie of
> marijuana and tucked it into the officer's shirt
> pocket, telling Schneider he could hold onto it and
> after they got the "20 piece," they "could primo it
> up." Sometimes marijuana is smoked together with co-
> caine base, which is referred to as a "primo." Schnei-
> der thought Lister was selling him the marijuana and
> asked the price, but Lister just told him to hold it
> until after they got the cocaine base.

07cv0822

[¶]  Lister asked for money for the cocaine base, telling Schneider that he could stay close to him, but should not look like he was with Lister. Schneider handed Lister a twenty dollar bill that had been previously photocopied. Lister first unsuccessfully tried to get cocaine base from some people inside a restaurant. He then approached a woman at a nearby bus stop. He handed the woman some money and she handed him a small object. When the police later arrested her, the photocopied twenty dollar bill Schneider had given to Lister was found in her possession.

[¶]  Lister told Schneider he had the rock cocaine. Schneider several times asked Lister for it, but Lister refused to give it to him. As they were walking, Lister asked Schneider if he had a pipe for smoking the cocaine. Schneider said he did. They walked to a parking lot, which was a common area for people to use drugs because it is largely hidden from the street, and they sat down on the small concrete barriers used to delineate the front edge of the parking spaces. Lister asked for the pipe, which Schneider handed to him. Lister then opened his hand, revealing a rock of cocaine base. Lister chipped small pieces off the rock and put the pieces in the pipe. At Lister's request, Schneider gave him the marijuana. As Lister proceeded to heat the small pieces of cocaine in the pipe with a lighter, Schneider gave the arrest signal.

[¶]  When Lister was arrested, he told the police that his name was Calvin Smith.

[¶]  On cross-examination, Detective Schneider testified this buy-bust operation was a little different from the routine situation because no one had ever given him marijuana before to act as collateral after he had handed over his money.

(Lodgment No. 5 at 2-3.)

## III.  **Procedural Background**

The San Diego County District Attorney's Office filed an Information charging Abner Haynes Lister with selling and furnishing a controlled substance, to wit: cocaine base, in violation of California Health and Safety Code ("Health and Safety Code") section 11352(a); possession of a controlled substance, to wit: cocaine base, in violation of Health and Safety Code section 11350(a); and giving false information to a peace officer, in

violation of California Penal Code ("Penal Code") section 148.9.
(CT at 1-3.)  The Information further alleged that Petitioner had
suffered numerous probation denial priors (Penal Code §
1203(e)(4)) and two prison priors (Penal Code §§ 667.5(b) & 668).
(CT at 3-4.)  A jury found Petitioner guilty of selling or
furnishing a controlled narcotic substance and giving false
information to a peace officer.  (CT at 195-196.)  The court
dismissed the lesser included offense of possession of a con-
trolled substance.  (CT at 146.)  Petitioner subsequently admit-
ted the alleged priors and was sentenced to a six (6) year term.
(CT at 194, 201.)

On June 1, 2006, Petitioner filed a direct appeal challeng-
ing his conviction and sentence in the California Court of
Appeal, Fourth Appellate District, Division One.  (Lodgment Nos.
3-4.)  In an unpublished opinion dated December 29, 2006, the
California Court of Appeal affirmed Petitioner's conviction and
sentence.  (Lodgment No. 5.)  On February 7, 2007, Petitioner
filed a Petition for Review in the California Supreme Court.
(Lodgment No. 6.)  That court denied the Petition for Review
without comment.  (Lodgment No. 7.)

Petitioner filed a petition for habeas corpus relief pursu-
ant to 28 U.S.C. § 2254 in this Court on May 7, 2007.  [Doc. No.
1.]  The original Petition raised four grounds for relief, but
the petition form indicated that Petitioner had failed to exhaust
his state court remedies as to Grounds Three and Four of the
Petition.  (Petition at 13-14.)  This Court issued a Notice
Regarding Possible Dismissal of Petition for Failure to Exhaust
State Court Remedies, informing Petitioner that he had filed a

07cv0822

petition containing both exhausted and unexhausted claims and setting forth his options.  [Doc. No. 3.]  After determining that Petitioner had formally abandoned the unexhausted claims raised in the original Petition, this Court issued an Order confirming Petitioner's abandonment of Grounds Three and Four and finding that "the Petition consists ONLY of Grounds One and Two."  [Doc. Nos. 8 and 9.]  Respondent filed an Answer on September 27, 2007, and Petitioner filed a Traverse on October 22, 2007.  [Doc. Nos. 12 and 13.]

## IV.  Discussion

### A. Standard of review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (emphasis added).

The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1
2
3

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4   28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

5      To obtain federal habeas relief, Petitioner must satisfy
6   either § 2254(d)(1) or § 2254(d)(2).  See Williams v. Taylor, 529
7   U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1)
8   & (2) as follows:

9      Under the "contrary to" clause, a federal habeas court
10     may grant the writ if the state court arrives at a
       conclusion opposite to that reached by this Court on a
       question of law or if the state court decides a case
11     differently than this Court has on a set of materially
       indistinguishable facts.  Under the "unreasonable
12     application" clause, a federal habeas court may grant
       the writ if the state court identifies the correct
13     governing legal principle from this Court's decisions
       but unreasonably applies that principle to the facts of
14     the prisoner's case.

15  Williams, 529 U.S. at 412-13; see also Lockyer v. Andrade, 538
16  U.S. 63, 73-74 (2003).

17     Where there is no reasoned decision from the state's highest
18  court, this Court "looks through" to the underlying appellate
19  court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).
20  If the dispositive state court order does not "furnish a basis
21  for its reasoning," federal habeas courts must conduct an inde-
22  pendent review of the record to determine whether the state
23  court's decision is contrary to, or an unreasonable application
24  of, clearly established Supreme Court law.  See Delgado v. Lewis,
25  223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by
26  Lockyer v. Andrade, supra, 538 U.S. at 75-76); accord Himes v.
27  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state
28  court need not cite Supreme Court precedent when resolving claims

6

1  presented on direct or collateral review.  Early v. Packer, 537

2  U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the

3  result of the state-court decision contradicts [Supreme Court

4  precedent,]" id., the state court decision will not be "contrary

5  to" clearly established federal law.  Id.

6      **B.   Ineffective Assistance of Counsel**

7      Petitioner contends that his Sixth Amendment right to

8  effective assistance of counsel was violated when the state court

9  denied his motions to appoint new counsel.  (Petition, Ground

10  One.)  Petitioner contends that his trial counsel, John R.

11  Fielding, was constitutionally ineffective because there was a

12  "total breakdown in communication" and Mr. Fielding "acted as an

13  advocate against" Petitioner.  (Petition at 8-10.)  Petitioner

14  raised these claims in a Petition for Review in the California

15  Supreme Court.  (Lodgment No. 6 at 9-14.)  That court denied the

16  petition without comment.  (Lodgment No. 7.)  Because the Cali-

17  fornia Supreme Court did not "furnish a basis for its reasoning,"

18  this Court must conduct an independent review of the record to

19  determine whether the state court's decision is contrary to, or

20  an unreasonable application of, clearly established Supreme Court

21  law.[1]  See Delgado v. Lewis, supra, 223 F.3d at 982; accord Himes

22  _____

23      [1]The Court will conduct an independent review of the record on
    this issue because Petitioner has presented his claim in his federal
    Petition differently than in his direct appeal in state court.  In
24  state court, Petitioner claimed on appeal that the trial court erred
    in denying his motions to substitute counsel.  (Lodgment Nos. 3 and
25  6.)  In this Court, Petitioner directly asserts a violation of his
    Sixth Amendment right to effective assistance of counsel.  (Petition
26  at 7.)  Because the state court did not analyze Petitioner's claim on
    appeal using law pertaining to ineffective assistance of counsel
27  claims, the state court of appeal's opinion does not furnish a basis
    for disposition of Petitioner's ineffective assistance of counsel
28  claim as presented in this Court, and this Court must therefore
    conduct an independent review of the record.

1   v. Thompson, supra, 336 F.3d at 853.

2       Under clearly established U.S. Supreme Court law, to estab-
3   lish ineffective assistance of counsel, Petitioner must show: (1)
4   "counsel's representation fell below an objective standard of
5   reasonableness" and (2) there is a reasonable probability that,
6   but for counsel's errors, the result of the proceeding would have
7   been different.  Strickland v. Washington, 466 U.S. 668, 688,
8   690, 692, 694 (1984).  The Court must review counsel's perfor-
9   mance deferentially.  Additionally, a wide measure of deference
10  must be given to counsel's tactical decisions.  Indeed, Strick-
11  land notes that "counsel's tactical decisions are virtually
12  unchallengeable." Strickland at 690; see also, Furman v. Wood,
13  190 F.3d 1002, 1007 (9th Cir. 1999).  A petitioner "must overcome
14  the presumption that, under the circumstances, the challenged
15  action 'might be considered sound trial strategy.'" Strickland
16  at 689 (citations omitted).

17      Petitioner claims that Mr. Fielding's representation could
18  not have been "effective" because he refused to speak with
19  Petitioner, resulting in a total breakdown in communication.
20  (Petition at 8-10.)  Petitioner contends that Mr. Fielding ceased
21  to function as an advocate on his behalf, and the state court
22  should have appointed substitute counsel.  (Id.)  Petitioner
23  argues that the conflict between him and Mr. Fielding had esca-
24  lated to the point that, by failing to appoint substitute coun-
25  sel, the court constructively denied him the effective assistance
26  of counsel in violation of his federal constitutional rights.
27  (Petition, Ground One.)
28  ///

8

07cv0822

The Ninth Circuit has stated that "to compel [an accused] to go to trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of counsel." Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970).  This does not mean that a court is required to provide an indigent defendant with the attorney of his choice.  Id.  Rather, a court presented with a motion to substitute counsel is required to make an appropriate inquiry into the grounds for the motion to determine whether the alleged conflict prevented effective assistance of counsel.  Schell v. Witek, 218 F.3d 1017, 1025-26 (9th Cir. 2000).

Here, Petitioner made two separate motions in which he requested that the trial court appoint new counsel.  (Lodgment No. 5 at 4-5.)  Under California law, these are referred to as "Marsden motions."  See People v. Marsden, 2 Cal.3d 118 (1970).  Following each motion made by Petitioner, the trial court held a hearing in which it inquired into Petitioner's grounds for requesting substitute counsel, in order to determine whether Petitioner was receiving ineffective assistance in violation of his Sixth Amendment rights.  (See Lodgment No. 2 ("RT"), Vols. 1 and 2.)  Each hearing was confidential, with only Petitioner, Mr. Fielding and the court present.  (1 RT at 1 and 2 RT at 101.)

During these hearings, Petitioner listed his reasons for requesting new counsel, which were summarized by the California Court of Appeal as follows:

> [¶] In April, 2005, about two weeks after the
> preliminary hearing, Lister made a *Marsden* motion.  He
> complained his attorney had a hearing problem and did
> not hear his request for a continuance; failed to visit
> him before the preliminary hearing; failed to discuss
> weaknesses in the evidence or Lister's strategy; failed

07cv0822

1    to ask more questions at the preliminary hearing; and
failed to obtain a good plea bargain. Lister admitted

2    his counsel had told him about a plea offer from the
district attorney, which required a prison term. Lis-

3    ter's counsel explained he received almost daily calls
from Lister before the preliminary hearing and spoke

4    with him "numerous times on the phone." He stated
Lister had presented him with a list of questions for

5    the preliminary hearing and he had asked all the ques-
tions that were appropriate. He had discussed a plea

6    bargain with the prosecutor but they were insisting on
a prison term, which Lister did not want. The court

7    denied the motion.

8          [¶] On June 30, 2005, Lister made another Marsden
motion. Lister stated that he and his attorney "dis-

9    agree upon a lot of things" and had "been arguing from
day one." He complained he wanted a motion to sever his

10   case from his codefendant (the woman who sold him the
cocaine base); his attorney had "never really dis-

11   cussed" with him what had happened but only knew what
was in the police report; his attorney misinformed him

12   about being on probation and parole at the same time;
and his attorney had not obtained a plea bargain or an

13   alternative of entering a rehabilitation program.
Lister also complained he had not been given copies of

14   all the transcripts. Lister told the court, "I really
don't have anything bad to say about [Mr. Fielding].

15   It's just we disagree upon a lot of things, the way I
want it done. You know, I know he's a professional but,

16   you know, I'd rather be for sure than to take a risk."

17   (Lodgment No. 5 at 4-5.)[2]

18        As noted above, Petitioner's complaints in the first <u>Marsden</u>

19   hearing centered on his dissatisfaction with the amount of

20   discussion he had with Mr. Fielding about the case and his

21   perception that Mr. Fielding did not ask the right questions at

22   the preliminary hearing.  (1 RT at 3-4.)  In finding that the

23   trial court appropriately denied Petitioner's request for new

24

25        [2]The California Court of Appeal recited these facts in analyzing
Petitioner's contention that the trial court erred in failing to

26   appoint new counsel to represent him after there had been a total
breakdown in communication with Mr. Fielding. (Lodgment No. 5 at 4-8.)

27   Petitioner's claim of trial error, although distinct from the Sixth
Amendment violation Petitioner asserts in his federal Petition,

28   necessarily requires similar discussion and analysis.  Thus, the
language and reasoning of the relevant portion of the Court of
Appeal's unpublished opinion is referenced herein.

1   counsel, the California Court of Appeal noted that a defendant

2   does not have a "right to have an appointed counsel pursue a

3   particular trial strategy." (Lodgment No. 5 at 7.)  This inter-

4   pretation is consistent with <u>Strickland</u>, which recognizes that

5   there is a strong presumption that counsel's tactical decisions

6   and strategic choices fall within the range of reasonably effec-

7   tive assistance. <u>Strickland</u> at 690-91.

8        Petitioner's second <u>Marsden</u> hearing included complaints

9   against Mr. Fielding for failure to obtain a plea bargain and,

10  generally, that Petitioner "disagree[d] with counsel on a lot of

11  things." (2 RT at 101.)  After hearing Petitioner's grievances

12  against Mr. Fielding, the trial court heard from counsel, who

13  explained that he had attempted to work out a plea bargain, but

14  that the District Attorney's Office would not offer a deal that

15  Petitioner was willing to accept. (2 RT at 108-109.)  Counsel

16  further stated that, although he believed the case was defensi-

17  ble, he agreed with Petitioner that the communication between

18  them had broken down to the point that counsel was limiting the

19  number of calls that he would accept from Petitioner because

20  Petitioner regularly harassed and abused counsel by screaming and

21  yelling at him and his staff. (2 RT at 109-110.)  The court

22  subsequently denied the motion, noting that although there

23  appeared to be abusive behavior coming from Petitioner directed

24  at Mr. Fielding and his staff, there was no indication that Mr.

25  Fielding was unwilling to present Petitioner's case or that

26  counsel had committed any misconduct. (2 RT at 109-110.)  The

27  court further stated that, if the court were to grant the motion,

28  it would essentially "give all defendants the complete freedom to

1   fire an attorney by choosing to be abusive with them," and the
2   law does not sanction that result.  (2 RT at 110-111.)

3       The Sixth Amendment right to effective assistance of counsel
4   does not guarantee a "meaningful relationship between an accused
5   and his counsel." <u>Morris v. Slappy</u>, 461 U.S. 1, 14 (1983).  In
6   this regard, the Ninth Circuit has stated that "[a] defendant's
7   refusal to cooperate with appointed counsel is no basis for a
8   claim of inadequate representation." <u>Plumlee v. Masto</u>, 512 F.3d
9   1204, 1207 (2008).  Accordingly, not every conflict or disagree-
10  ment between an accused and his counsel implicates Sixth Amend-
11  ment rights.  <u>Schell v. Witek</u>, <u>supra</u>, 218 F.3d at 1027.  The
12  critical issue is whether the alleged conflict "prevented effec-
13  tive assistance of counsel" or resulted in "an attorney-client
14  relationship that fell short of that required by the Sixth
15  Amendment." <u>Id.</u> at 1026.  Applying the test laid out in
16  <u>Strickland</u>, Petitioner must show that the conflict was so sub-
17  stantial that defense counsel's representation "fell below an
18  objective standard of reasonableness." <u>Strickland</u> at 688.

19      In denying Petitioner's claim that the trial court erred by
20  denying his <u>Marsden</u> motions, the California Court of Appeal noted
21  that "a defendant is not entitled to newly appointed counsel on
22  the basis he does not like his counsel and does not think highly
23  of his counsel." (Lodgment No. 5 at 6-7.)  The Court of Appeal
24  correctly stated that a defendant is required to make a substan-
25  tial showing that "such an irreconcilable conflict has developed
26  between himself and the attorney that ineffective representation
27  is likely to result." (<u>Id.</u> at 6.)  Although the trial court
28  found that there was some evidence of a communication breakdown,

1   much of the problem appeared to be the result of Petitioner's
2   abusive conduct towards Mr. Fielding.  (2 RT at 110.)  Moreover,
3   despite the apparent conflict, the trial court found that Mr.
4   Fielding was able to develop a reasonable trial strategy.
5   (Lodgment No. 5 at 7.)  The trial court even noted that Peti-
6   tioner's attorney was one of the best criminal defense attorneys
7   in San Diego.  (2 RT at 111.)

8         After an independent review of the record, it is clear that
9   the trial court held the appropriate hearings to inquire into the
10  grounds for Petitioner's requests for new counsel and appropri-
11  ately determined that Petitioner's dissatisfaction with his
12  attorney did not impair Petitioner's right to effective assis-
13  tance of counsel.  Petitioner has failed to show that any
14  conflict between Petitioner and defense counsel resulted in
15  representation that was objectively unreasonable.  Thus, the
16  California Supreme Court's denial of this claim was not contrary
17  to, or an unreasonable application of, <u>Strickland</u>, and the claim
18  should be denied.

19        C.  <u>**Right to Trial by Impartial Jury**</u>

20        Petitioner contends that his federal constitutional right to
21  a trial by impartial jury was violated when the trial court
22  refused to grant him a new trial after one of the jurors engaged
23  in misconduct.  (Petition, Ground Two.)  Petitioner contends that
24  because one juror conducted Internet research regarding possible
25  penalties and discussed his findings with the other jurors during
26  deliberations, Petitioner was denied the right to a fair trial
27  before an impartial jury.  (Petition at 11.)  On this issue, the
28  California Supreme Court denied Petitioner's Petition for Review

07cv0822

without comment.  (Lodgment No. 7.)  Thus, this Court must "look

through" to the California Court of Appeal's decision underlying

that denial as the basis for its analysis.   See Ylst v.

Nunnemaker, supra, 501 U.S. at 801-06.

The alleged misconduct in this case occurred during jury

deliberations and after the court had properly instructed the

jury regarding its duties and obligations.  (5 RT at 356-373.)

The jurors were told that they "must decide all questions of fact

in this case from the evidence received in this trial and not

from any other source." (CT at 100, 5 RT at 358.)  The jury was

further instructed not to "discuss or consider the subject of

penalty or punishment.  That subject must not in any way affect

your verdict." (CT at 135, 5 RT at 372.)

Shortly after beginning deliberations, the trial court

received a note from the jury that one of the jurors had con-

ducted online research regarding possible penalties for the

charges involved in the case.  (CT at 192, 5 RT at 408.)  The

court decided that the best way to handle this was to interview

each of the jurors individually, beginning with the foreperson,

to determine the circumstances leading to the jury's note and to

determine if each juror could be fair and impartial.  (5 RT at

408.)  Finding that Juror No. 2 did in fact research penalties

online, the trial court excused him and replaced him with an

alternate.  (5 RT at 416.)  As to the remaining eleven jurors,

the court individually questioned each one as to whether he or

she could disregard the outside information revealed by Juror No.

2 and decide the case based only on the evidence presented at

trial.  (Lodgment No. 5 at 9.)  Each of the remaining eleven

07cv0822

1   jurors stated that he or she would be able to disregard the

2   information and deliberate fairly and impartially.  (5 RT at

3   432.)

4        Mr. Fielding subsequently moved for a mistrial, arguing that

5   the extrinsic information was presumptively prejudicial and could

6   not be disregarded by the remaining jurors.  (6 RT at 434.)  The

7   court denied the motion, stating that it was "reassured by the

8   emphatic nature of each and every response that they could start

9   all over . . . and absolutely disregard the information from the

10  one juror."  (6 RT at 439-440.)  The court did, however, re-

11  instruct the jury about the importance of not considering penalty

12  and punishment and confirmed with the jurors that they would be

13  able to disregard any extraneous information and decide the case

14  fairly and impartially.  (6 RT 442-443.)

15       Petitioner contends that not all of the jurors could be

16  impartial after hearing information about the penalties he might

17  be facing if convicted.  (Petition at 11-12.)  Petitioner further

18  argues that the receipt of extrinsic information regarding

19  possible penalties was inherently prejudicial and that, as a

20  result, he was denied his constitutional right to a fair trial by

21  a panel of impartial jurors.  (Petition at 11-12.)

22       A criminal defendant's right to a fair trial by a panel of

23  impartial jurors is one of the most priceless safeguards of

24  individual liberty and is a basic requirement of due process.

25  Irvin v. Dowd, 366 U.S. 717, 721-22 (1961).  Although the right

26  to an impartial jury is explicitly guaranteed to the criminally

27  accused under the Sixth Amendment, the U.S. Supreme Court has

28  noted that "[i]mpartiality is not a technical conception.  It is

07cv0822

a state of mind.  For the ascertainment of this mental attitude

of appropriate indifference, the Constitution lays down no

particular tests . . . ."  U.S. v. Wood, 299 U.S. 123, 145-46

(1936).  For this reason, trial courts are given significant

discretion in determining whether a jury can be impartial, and

such findings of impartiality will be overturned only when

prejudice is "manifest."  Irvin v. Dowd, supra, 366 U.S. at 723

(citing Reynolds v. United States, 98 U.S. 145, 156 (1878)).

Under clearly established U.S. Supreme Court law, the right

to a trial by impartial jury "means a jury capable and willing to

decide the case solely on the evidence before it."  Smith v.

Phillips, 455 U.S. 209, 217 (1982).  However, because it is

virtually impossible to shield jurors from every influence that

may affect their vote, due process does not require a new trial

every time a juror has been potentially influenced or compro-

mised.  Id.  Rather, determinations regarding a juror's ability

to fairly and impartially deliberate may properly be made at a

hearing in which the trial court assesses the impact of the

information received and whether it was prejudicial.  Remmer v.

United States, 347 U.S. 227, 229-30 (1954); Smith v. Phillips,

supra, 455 U.S. at 217.

At Petitioner's trial, the court applied the standard for

impartiality required under Smith by individually questioning

each juror about the information received and confirming that all

of the jurors could deliberate "only on the evidence" presented

at trial.  (5 RT at 408-432.)  See Smith, supra 455 U.S. at 217.

By speaking with the jurors individually, the trial court had the

opportunity to adequately assess the impact of the information

07cv0822

and determined that the jury could decide the case fairly and
impartially.  (5 RT at 432.)  The jurors were also given the
weekend to contemplate their responses and, when asked again,
none of the jurors indicated that they would be anything less
than impartial.  (5 RT at 432, 6 RT at 442.)  Petitioner contends
that the trial court should not have based its determination that
the jurors could be impartial on the jurors' own statements and
reassurances.  (Petition at 12.)  However, in hearings regarding
juror impartiality, juror testimony should not be viewed as
inherently suspect because "one who is trying as an honest man to
live up to the sanctity of his oath is well qualified to say
whether he has an unbiased mind in a certain matter."  Smith,
supra, 455 U.S. at 217, n.7, quoting Dennis v. United States, 339
U.S. 162 (1950).  The record indicates that the trial court's
determination of impartiality was entirely consistent with the
due process requirements set forth in Smith.

The California Court of Appeal denied Petitioner's claim
that the trial court erred by refusing to grant a mistrial based
on the presumptively prejudicial effect of the jury's exposure to
the extrinsic information.  (Lodgment No. 3 at 13-16.)  In
denying this claim, the Court of Appeal employed a strikingly
similar rationale to that used by the U.S. Supreme Court in
setting forth the principles for determining juror impartiality.
Most notably, the Court of Appeal borrowed language from the U.S.
Supreme Court's opinion in Smith when it defined an impartial
jury as "one in which no member has been improperly influenced
and every member is 'capable and willing to decide the case
solely on the evidence before it.'"  (See Lodgment No. 5 at 10;

1    Smith, supra, 455 U.S. at 217.)  The Court of Appeal also stated

2    its rationale in substantially similar language to the Smith

3    Court, noting that "it is impossible to shield jurors from every

4    contact that may influence their vote."  (See Lodgment No. 5 at

5    11; Smith, supra, 455 U.S. at 217.)  The Court of Appeal went on

6    to state that the trial court is "vested with considerable

7    discretion" in determining juror impartiality.  (Lodgment No. 5

8    at 11.)  Indeed, trial courts are given significant discretion in

9    determining whether a jury can be impartial, and a state court's

10   findings regarding juror impartiality are presumptively correct.

11   Smith, supra, 455 U.S. at 218.

12       This Court finds that the California Supreme Court reason-

13   ably applied the Smith standard in denying Petitioner's claim

14   that he was deprived of the right to a fair trial by an impartial

15   jury.  Thus, the state court's denial of Petitioner's claim was

16   neither contrary to, nor an unreasonable application of, clearly

17   established Supreme Court Law.  Therefore, the claim should be

18   denied.

19       Moreover, even if Petitioner could successfully prove that

20   the state court's finding of jury impartiality amounted to a

21   constitutional error, Petitioner's claim would nonetheless fail

22   because, in any event, the state court's determination meets the

23   harmless error standard set forth by the U.S. Supreme Court in

24   Brecht v. Abrahamson, 507 U.S. 619 (1993).  Under Brecht, "the

25   standard for determining whether habeas relief must be granted is

26   whether the . . . error had substantial and injurious effect or

27   influence in determining the jury's verdict."  Id. at 623.

28       Applying the Brecht harmless error analysis to Petitioner's

07cv0822

case requires an assessment of whether the extrinsic information

regarding penalty had a "substantial and injurious effect or

influence in determining the jury's verdict."  Id.  The Ninth

Circuit, applying the "substantial and injurious" standard to a

case involving jury receipt of improper extrinsic material, has

noted that "jury exposure to facts not in evidence deprives a

defendant of the rights . . . embodied in the Sixth Amendment."

Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995).  The court

recognized several relevant factors in determining whether a

jury's exposure to extrinsic information "substantially and

injuriously" affected the verdict.  These factors include:

> [¶] (1) whether the extrinsic material was actu-
> ally received, and if so, how; (2) the length of time
> it was available to the jury; (3) the extent to which
> the jury discussed and considered it; (4) whether the
> material was introduced before a verdict was reached,
> and if so, at what point in the deliberations it was
> introduced; and (5) any other matters which may bear on
> the issue ... .

Lawson, 60 F.3d at 612.

Applying the first Lawson factor to Petitioner's case, Juror

No. 2's receipt of the information via the Internet was contrary

to the trial court's instruction, and he was accordingly excused

for this misconduct.  (5 RT at 416.)  It is apparent from the

record that the rest of the jury, having heard the results of

Juror No. 2's research, immediately recognized that the extrinsic

information should not be considered and notified the trial judge

of Juror No. 2's conduct in violation of her instruction.  (6 RT

at 439.)

Applying the second factor, the record indicates that the

length of time the information was available to the jury was

extremely short, as the jurors notified the court within five minutes of Juror No. 2's announcement of his Internet findings. (5 RT at 412.)  Applying the third Lawson factor, the extent to which the jury discussed the information before notifying the court was minimal, as they were all aware that discussion of such information was contrary to the trial judge's instruction.  Some of the jurors, in fact, did not even hear the substance of Juror No. 2's "findings."  (5 RT at 410-412.)

Applying the fourth Lawson factor, Juror No. 2's announcement of his findings was made ten to fifteen minutes into the deliberations, well before a verdict was reached.  (5 RT at 411.) The trial judge was able to take reasonable steps to ensure that the information received did not substantially or injuriously affect the jury's deliberations or its verdict.  After replacing Juror No. 2 with an alternate, the trial court gave the jury the weekend before returning to start deliberations anew.  (5 RT at 433.)  The trial court interviewed each of the remaining jurors and confirmed that they could be impartial and that each of them was willing and able to disregard the extrinsic information regarding penalty or punishment.  (5 RT at 432.)  The court then reinstructed the jurors about the importance of not considering penalty and punishment.  (6 RT at 442.) After commencing deliberations, the jury reached a verdict in just over one hour.  (CT at 193.)

It is important to note that Ninth Circuit law places great weight on the nature of the information received in assessing prejudice claims in juror misconduct cases.  Lawson, supra, 60 F.3d at 612.  Specifically, the question is whether "the extrin-

07cv0822

1   sic information directly related to a material issue in the

2   case," and whether there is a "direct and rational connection

3   between the extrinsic material and a prejudicial jury conclu-

4   sion." Id.  Consequently, in finding that the trial court

5   correctly denied a mistrial, the California Court of Appeal

6   properly based its decision partly on the fact that the inform-

7   ation received was not inherently prejudicial to Petitioner.

8   (Lodgment No. 5 at 12.)  Information about penalty or punishment

9   does not relate to a material issue in the jury's determination

10  of Petitioner's guilt or innocence, and has no rational connec-

11  tion to the allegation of a prejudicial jury conclusion.  See

12  Lawson, supra, 60 F.3d at 612-13; accord, U.S. v. Bagnariol, 665

13  F.2d 877, 884-87 (9th Cir. 1981).  Moreover, the dismissal of the

14  juror who conducted the independent research and the trial

15  court's thorough investigation of the incident further support

16  the state court's finding that the extrinsic information did not

17  substantially or injuriously affect the jury's verdict.  (5 RT at

18  409-432.)  See Brecht, supra, 507 U.S. at 623.

19      This Court finds that the trial court properly addressed

20  each of the factors set out by the Ninth Circuit in Lawson and

21  that the record supports the finding that the information re-

22  ceived by the jury did not have a substantial and injurious

23  effect or influence on the jury's verdict.  Id.  Thus, the state

24  court's denial of Petitioner's claim was not contrary to, or an

25  unreasonable application of, Brecht.  Accordingly, Petitioner's

26  claim should be denied.

27  ///

28  ///

07cv0822

**V.    Recommendation**

     After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.   Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

     This Report and Recommendation is submitted to the Honorable Roger T. Benitez, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

     **IT IS ORDERED** that not later than **May 9, 2008**, any party may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."

     **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **May 23, 2008.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

     **IT IS SO ORDERED.**

DATED:   April 9, 2008

                                         Jan M. Adler
                                         U.S. Magistrate Judge